166

THE STATE OF WASHINGTON, *Respondent*, v. DeShawn C. Clark, *Appellant*.

168

*Oliver R. Davis* (of *Washington Appellate Project*), for appellant.

*Daniel T. Satterberg, Prosecuting Attorney*, and *Andrea R. Vitalich, Deputy*, for respondent.

¶1 SCHINDLER, J. — A jury convicted DeShawn C. Clark of human trafficking in the second degree of T.G., promoting prostitution in the first degree of T.G., unlawful imprisonment of T.G., promoting commercial sexual abuse of H.R. and N.S., and conspiracy to commit promoting prostitution in the first degree. The jury also found that Clark committed the crime of conspiracy to commit promoting prostitution with the intent to benefit, profit, or otherwise advantage a criminal street gang. Clark argues insufficient evidence supports the convictions of commercial sexual abuse of N.S. and human trafficking of T.G. In the alternative, Clark claims that either the convictions for human trafficking and promoting prostitution violate double jeopardy, or the convictions for unlawful imprisonment and human trafficking or promoting prostitution violate double jeopardy. We remand for resentencing. In all other respects, we affirm.

## FACTS

¶2 West Side Street Mobb (WSSM) is a criminal street gang in West Seattle. "Mobb" is an acronym for "Money Over

Broke Bitches" that means "money first before you talk to bitches." The primary objective of WSSM gang members was to make money from drug dealing, bank fraud, and prostitution.

¶3 DeShawn "Cash Money" Clark, Thomas "Mario" Foster, Donte "Tay" Walters, Gamata "G Bez" Abdullah, Elijah "E Pill" Cane, Jeffrey "Little Pill" Knox, Desmond "Goldie" Manago, and Mycah Johnsen were members of WSSM and were engaged in promoting prostitution. Clark, his older brother Shawn Clark, Mycah Johnsen, Gerald Jackson, and Jewan Spinks also identified themselves as members of "Crime Fam."

¶4 When Clark and 18-year-old T.G. began dating in August 2007, she had a job at Kentucky Fried Chicken and was living in an apartment. Approximately two months later, T.G. had lost her job and was evicted from her apartment. In October, T.G. and Clark were living with Clark's mother. At Clark's urging, T.G. agreed to work as a prostitute to earn money.

A. When I lost my job and didn't have anywhere to stay, it was the option that [Clark] gave me.

Q. What do you mean it was the option that he — he gave you?

A. He told me that that's how I could get money.

Q. All right. And would it be fair for me to say the [sic] at first that was something you were willing to do?

A. Yes.

¶5 In October 2007, 15-year-old H.R. was working as a prostitute for Gamata and staying in a motel on Pacific Highway South. H.R. said that one day when she came back from "walking the track," Gamata and Clark were in the motel room with T.G. H.R. testified that Gamata and Clark told her to "go take [T.G.] out and show her how" to prostitute. H.R. said that Gamata and Clark told H.R. and T.G., "Just go out there and make some money." H.R. and T.G. wanted to walk the track together, but Gamata and Clark told them to split up so they could make more money.

Me and [T.G.] decided we would — we came up with this thing where we can, you know, both of us can walk side by side together, you know, to avoid cops to avoid, you know, maybe we'll make some more money walking both of us down, you know, by each other or whatever.

So — and then when we weren't really making that much money they told us, Well, just split up, you go on one side of the street and you go on the other side of the street.

¶6 Later that same month, H.R. left Gamata and went to work as a prostitute for Clark. H.R. said that she earned between $500 and $800 a day, and gave the money to Clark. H.R. testified that she worked for Clark for approximately two weeks before she left and returned home.

¶7 T.G. said that when she worked as a prostitute in 2007, she worked most days and earned between $500 and $1000 a day. T.G. said that when she did not work and "didn't bring any money back," Clark did not "beat [her] up for it."

¶8 In late November, Clark, T.G., Walters, and F.S., the 16-year-old girl working for Walters, went to Las Vegas for approximately a week and a half to stay with WSSM member Roosevelt "City Red" Johnson. On December 5, Clark accused T.G. of hiding money from him and told her, "You're not going to keep anything from me. You're not going to hide money from me." T.G. said that Clark forced her to strip naked in front of Walters and City Red, and hit her on "[m]y face, my head, my arms, my legs, just kicking and hitting."

¶9 The next day, T.G. went to the emergency room of a hospital in Las Vegas. T.G. said the injuries were the result of "a fight with somebody." T.G. testified that she did not tell the truth because she was scared that she would "go to jail" for engaging in prostitution.

¶10 After returning to Seattle, T.G. left Clark and turned off her cell phone. T.G. testified that in early January 2008, Clark came to her grandmother's house and threatened to

kill her because she "turned the text messaging off" on the phone and did not respond to his text messages. T.G. said that she "caught the first bus that left [town]" and went to stay with her mother in Wisconsin.

¶11 Around the same time that T.G. went to Wisconsin, 16-year-old N.S. started working for Clark as a prostitute. After N.S. ran away from home, her mother often went to Pacific Highway South to hand out missing person fliers. N.S.'s mother testified that on one occasion, Clark approached her and said that he had N.S. "wound up so tight she would never come home."

¶12 T.G. testified that after she left Seattle in January 2008, she "cut off communication [with Clark] entirely." Nonetheless, Clark continued to try to contact T.G. Because she still loved him, T.G. eventually talked to Clark. Clark repeatedly told T.G. that he loved her. Clark promised that if she returned, they would be together, "things were going to be okay again," and "he wasn't going to hit [her] anymore." T.G. believed Clark, and on June 18, 2008, she returned to Seattle.

¶13 T.G. testified that at first, Clark fulfilled his promise. But within the first week that she started working as a prostitute, Clark treated her harshly and was violent.

¶14 At Clark's direction, T.G. stayed in hotels and posted advertisements for sex on Internet web sites. T.G. said that "[m]ost of the time [Clark] stayed in the hotel" room, but when she had a date, he would leave and sit in the car. T.G. testified that Clark kept "tabs" on her by requiring her to text him to report about customers and the money she was making. T.G. said that Clark told her she was "not allowed to talk to any males unless it was for money." Clark made T.G. refer to him as her pimp, call him "Daddy," and forced her to get a tattoo of a money bag on her stomach.

¶15 T.G. described a typical day as follows:

Get up around 1 o'clock in the afternoon. Then [Clark] would tell me to post some ads, post some ads, and just sit and wait for

calls. I wasn't allowed to eat until I made some money that day. If I didn't make any money, then it would be, if I was lucky, get to eat once that day.

I would work until he decided that it was enough or until it reached anywhere from 3, 4 o'clock in the morning, and even after that, if a call came in with a substantial amount of money, he would make me take it.

¶16 T.G. testified that Clark berated her and beat her if she did not follow his rules. T.G. said that Clark would also punish her by putting her "to sleep," or choking her until she lost consciousness. From June to November 2008, N.S., H.R., A.B., and a girl named "Ice" also worked as prostitutes for Clark. But T.G. was the only one that he "beat up."

¶17 T.G. said that she complied with Clark's demands because "of what he . . . was capable of doing to me" and the fear of getting "beat up."

It was more of what he, himself, was capable of doing to me and being hit all the time and punched all the time. It scared me into just doing what he told me to do. I did it, no ifs, ands, or buts about it. If I didn't do what he told me to do, I would get beat up, so I just started following the rules.

¶18 In late summer 2008, Clark, his brother Shawn, and Gerald Jackson took T.G., J.Z., and S.A. to Portland, Oregon, to engage in prostitution. Clark paid for the hotel suite. T.G., J.Z., and S.A. posted advertisements on the Internet and used the hotel room for customers. Meanwhile, Clark, Shawn, and Jackson went to the shopping mall.

¶19 T.G. said that she did not contact the police because "I was scared . . . knowing that there's so many . . . people from [WSSM] that could come after me." But on October 30, 2008, T.G. called 911 after Clark choked her until she lost consciousness and hit her head on the bathroom wall. Tukwila Police Officer Todd Bisson responded to the 911 call. Officer Bisson said that T.G. was crying and had "a very large welt on her left eye that was purple," but did not want to talk about what happened. T.G. repeatedly said she

should not have called the police, and lied about what happened.

¶20 In 2008, Seattle Police Department (SPD) Detective Todd Novisedlak and Detective Bill Guyer worked in the Vice Unit. The SPD Vice Unit works with the Federal Task Force and Federal Bureau of Investigation (FBI) to combat juvenile prostitution.

¶21 At the beginning of November 2008, Detective Novisedlak and Detective Guyer interviewed L.J. about the abduction and assault that occurred on November 3. Mario Foster is the father of L.J.'s two young children. L.J. said that in October, Foster made her work as a prostitute. L.J. told the Detectives that she did not want to work as a prostitute, but she "was more afraid of what [Foster] would do to her if she didn't do it." After L.J. told Foster "she couldn't do it anymore," he left a message on October 30 threatening "to come over and shoot up the whole house. . . . I got something for all you motherfuckers. . . . That's all right. I got something for all y'all."

¶22 When Foster saw L.J. at a McDonald's on November 3, he ordered her to get into Clark's green Lexus. L.J. said that while Clark was driving, Foster got into the backseat and yelled at her, demanding money and hitting her in the face.

> Foster . . . went into the backseat and grabbed her by the throat and started choking her. He headbutted her in the left eye with his forehead and started yelling at her, You think this is some fucking game, bitch?
>
> He then hit her three times in the mouth with his fists hard enough to bleed and swell and asked her if she had any money.
>
> She told him she had just a little bit for the baby's diapers and things and he ordered her to give him the money. And when she told him no, he started going through her pockets and took $150 from her pants, her back pants pocket. He also took her cell phone and — and told her, Bitch, you're going back on the track.

¶23 When Clark arrived at a motel on Pacific Highway South, Foster gave L.J. a dollar and told her to "go hit the track." L.J. took the money and left. L.J. told the Detectives that Clark owned the green Lexus and T.G. worked for him as a prostitute.

¶24 In an effort to locate Foster and Clark, Detective Guyer posed as a customer and answered an Internet advertisement posted by T.G. Detective Guyer arranged a date with T.G. for November 7 at the Hilton in SeaTac. When Detective Guyer and Detective Novisedlak arrived, they told T.G. they wanted to talk to her as part of the investigation into the abduction and assault of L.J. Detective Novisedlak said T.G. was afraid to talk to them.

> She was very afraid. It was — it was odd in that we were secure in the room, everybody in the room had identified themselves, we — we assured her no harm was coming to her. But she was very nervous, very afraid.

T.G. lied to the Detectives, and told them that Desmond "Goldie" Manago was her pimp and Clark was "the errand boy for him." T.G. said that she lied because she was scared.

¶25 On November 12, T.G. went to stay at a Travelodge "to hide my money and computer . . . so I could leave." Clark went to the Travelodge, tore the room apart, and took the laptop computer. When they were in the parking lot, Clark smashed the computer on the ground and punched T.G. in the face so hard it "just exploded with blood." T.G. said that after she fell to the ground, Clark picked her up, put her in the back of his El Camino, and drove away.

¶26 Hotel clerk Eric Noel testified that he saw Clark grab the laptop from T.G. and smash it on the ground. Noel saw Clark punch T.G. with a closed fist and "hit her . . . directly in the face." Noel said that when T.G. fell to the ground, she was moaning. Noel testified that Clark was "standing over her" and yelling at her before he picked T.G. up and put her in the back of the El Camino "like a box or something." Noel called 911.

¶27 T.G. testified that when Clark slowed down at a stop sign, she got out of the El Camino and ran back to the Travelodge. The medics took T.G. to Highline Hospital. T.G. called Detective Novisedlak from the hospital. Detective Novisedlak made arrangements for T.G. to stay in a secure shelter after she was released from the hospital.

¶28 The next day, the police executed a warrant to search Shawn Clark's apartment. The police seized a large quantity of marijuana and several cell phones, and arrested Clark and his brother Shawn. Clark was released the next day.

¶29 Detective Novisedlak interviewed T.G. on November 18 and 21. During the interviews, Detective Novisedlak learned that Clark was a member of WSSM, and that he forced T.G. to work for him as a prostitute. On November 20, 2008, the State charged DeShawn C. Clark and Thomas L. Foster with promoting prostitution in the first degree, domestic violence assault in the second degree, and malicious mischief.

¶30 After the interview on November 21, T.G. made three "frantic" phone calls to Detective Novisedlak. In the first call, T.G. told the detective that Mario Foster confronted her in the bus tunnel and "relayed a threat [t]hat Cash was going to kill her." In the second call, T.G. said that a dark colored "Honda Civic-type vehicle" approached her as she was walking down the street, somebody yelled out, "Street Mobb, bitch," and "shot [her] in the head" with a BB. In the third call, T.G. was "frantic" because Mario and Gamata were standing outside the secure shelter.

> The last phone call that day, again, frantic, she had just been dropped off at the secure shelter in Seattle. And pulling up she noticed Thomas Foster and another individual that she knew as Gamata or G Bez standing outside the shelter.

Detective Novisedlak immediately went to the shelter. Detective Novisedlak documented her injuries and "scramble[d]" to locate another secure shelter for T.G.

¶31 On February 2, 2009, the FBI, King County prosecuting attorneys, King County deputies, and SPD Detective Novisedlak conducted a lengthy joint interview of T.G.

¶32 On March 20, 2009, the State filed a second amended information charging DeShawn C. Clark, Thomas L. Foster, Shawn S. Clark, Gerald N. Jackson, Mycah M. Johnsen, and Desmond T. Manago with human trafficking, promoting prostitution, assault, and violation of the Uniform Controlled Substances Act, chapter 69.50 RCW, during the period of time intervening between June through December 2008, and promoting commercial sexual abuse of a minor in 2007.

¶33 In May, the United States Attorney issued subpoenas to a number of witnesses to testify before a grand jury about bank fraud, prostitution, and WSSM. In June, Mycah Johnsen pleaded guilty to the state court charges and agreed to testify on behalf of the State. In exchange, the United States Attorney agreed to not file federal charges against Johnsen.

¶34 In his written plea agreement, Johnsen admits he is a member of WSSM and that beginning in June 2008, C.D. worked for him as a prostitute. Johnsen described how WSSM members "work together to sell drugs, commit bank fraud, run guns, use violence to increase the gang's influence, or pimp out girls." Johnsen identified Clark, his brother Shawn Clark, Mario Foster, and Gerald Jackson as pimps and members of WSSM or Crime Fam.

¶35 Johnsen states that Clark "showed me how to pimp. He would tell me where I should have CD work and would explain how to use Craigslist to post ads [and] I was to keep all of [the money]." Johnsen states Clark instructed him about how to "sell the dream" by convincing a girl he was in love with her so that she eventually would do anything for him, including working as a prostitute. Johnsen said that T.G. "worked for 'Cash.'" Johnsen also states that Clark "beat [T.G.] when she either disobeyed him or did not make him enough money."

¶36 On August 4, Desmond Manago pleaded guilty to the charges in state court. On August 27, Shawn Clark, Mario Foster, and Gerald Jackson pleaded guilty. Shawn Clark admitted that in 2008, A.R. and J.Z. worked for him as prostitutes, and he was a member of Crime Fam and "an associate" of WSSM. Shawn pleaded guilty to felony violation of a no-contact order, witness tampering, promoting prostitution, and the aggravating factor of committing the crime of promoting prostitution to benefit WSSM.

¶37 Foster pleaded guilty to promoting prostitution of A.W. and L.J., assault in the second degree of L.J., and the aggravating factor of committing the crime of promoting prostitution to benefit WSSM. Jackson pleaded guilty to promoting prostitution in the first degree of S.A., and the aggravating factor of committing the crime to directly or indirectly benefit the criminal street gang WSSM.

¶38 The State filed an amended information charging Clark with human trafficking in the second degree of T.G. between June 15, 2008 and December 1, 2008, Count I; human trafficking in the second degree of N.S. from June 15, 2008 through March 31, 2009, Count II; promoting prostitution in the first degree of T.G. between June 15, 2008 and December 1, 2008, Count III; promoting commercial sexual abuse of H.R. (date of birth November 15, 1991) and N.S. (date of birth August 8, 1991), Count IV and Count V; assault in the second degree by strangulation of T.G. on October 30, 2008, Count VI; unlawful imprisonment of T.G. on November 12, 2008, Count VII; possession with intent to deliver marijuana in violation of the Uniform Controlled Substances Act on November 13, 2008, Count VIII; and criminal conspiracy to promote prostitution in the first degree from June 15, 2008 through September 30, 2009, Count IX. The State also alleged as an aggravating factor that Clark committed the crimes with the intent to benefit or advantage a criminal street gang under RCW 9.94A.535(3)(aa).

¶39 The 26-day trial began in October 2009. The transcript of the trial is more than 5,000 pages. A number of

witnesses testified on behalf of the State, including T.G., H.R., H.R.'s parents, N.S., N.S.'s mother, L.J., Mycah Johnsen, the hotel clerk who called 911 on November 12, and the SPD Vice Unit detectives. The court admitted over 200 exhibits, including receipts for hotels, Internet postings, and cell phone text messages.

¶40 Mycah Johnsen testified that WSSM members gained respect and status by making money. Johnsen described the "gang lifestyle" and how WSSM members work together to "pimp out girls." Johnsen said that Clark was a very successful pimp, respected by WSSM members. Johnsen testified that Clark bragged about the amount of money he made from prostitution and instructed him on how to succeed as a pimp:

> Just don't fuck her until she give you some money. I mean but at the same time show the bitch that you're gonna be there. You know, sweet talk the bitch and play the nice guy. Tell her what she wants to hear and think about what a bitch could say to you and treat . . . you like to make you come out of their pockets and say and do with the bitch because your mind is stronger than hers. And when you get her so sprung to the point where she is — can't fucking — to the point where she can't fucking live without you switch up on the bitch and the kiss. Don't fuck the — don't fuck her. Cash first, ass last. Simps [(fake pimps)] think with their dick.

> Q. So selling a dream. Is that what we're seeing here? Is that what you're telling him?

> A. Right. Yeah.

¶41 N.S. testified that Mycah Johnsen was her pimp and Clark was her boyfriend. N.S. admitted that she had a tattoo on her thigh that said "Cash," a "bag of money" tattoo on her right ankle, a tattoo that said "Money's all I think about," and a recent tattoo on her chest that said "Daddy's girl." Except for the tattoo on her thigh, N.S. denied that any of the other tattoos referred to Clark. The State impeached N.S. with a number of exhibits that show N.S. worked for Clark as a prostitute, including her MySpace postings, text messages, and taped conversations while Clark was in jail.

¶42 Clark testified that he was not a member of WSSM. Clark said that Crime Fam is a rap group. Clark denied that T.G., H.R., or N.S. worked for him as prostitutes. Clark testified that the first time he learned that T.G. was involved in prostitution was during the trip to Las Vegas. Clark also testified that while they were in Las Vegas, T.G. got into a physical altercation with a woman who was engaged to City Red's father. Clark admitted that he had a sexual relationship with T.G. but said he was involved in "a long-term . . . on-and-off again relationship" with A.B.

¶43 Clark testified that T.G. worked as a prostitute for Goldie. Clark admitted that he saw T.G. "all the time" after she returned from Wisconsin in June 2008, and that T.G. gave him money that she made from working as a prostitute. Clark testified that in late summer 2008, he drove his brother Shawn, Jackson, J.Z., S.A., and T.G. to Portland in his green Lexus. Clark admitted that the hotel suite was registered in his name. Clark said he "went down there to go shopping, but my brother and them go down and do what they do. . . . To pimp." Clark denied choking T.G. on October 30.

¶44 Clark testified that on November 12, he went to the Travelodge to retrieve his laptop computer from T.G. Clark said T.G. was angry about his relationship with A.B. Clark testified that he told T.G. he "wasn't messing with her no more. . . . No sexual relationship, no friends no nothing." Clark said that when he took the laptop and left, T.G. chased after him yelling, "Give me the laptop. I'm, like, No, it's my laptop. And then just to stop it I said, Well, if I can't have it, you can't have it. I just broke it."

¶45 Clark testified that when T.G. attempted to hit him, "I swung my hand and I smacked her in the mouth." Clark said that as he started to drive off, T.G. jumped in the back of the El Camino and he told her to get out. Clark denied that he "picked [T.G.] up and put her in the car, at all, ever," and said the hotel clerk was "coached . . . to say that."

¶46 During cross-examination, the State introduced a number of text messages that were sent and received by Clark, including a text message that Clark sent to K.V. on November 12. The text message states, in pertinent part, "I just fired the white bitch. Come fuck with me, mom. I'll show you how — I'll show you how to be treated." Clark also admitted that he asked N.S. to get someone to talk to T.G. before the trial, and he instructed N.S. to make sure to tell everyone that Johnsen was a "snitch."

¶47 The jury found Clark not guilty of human trafficking in the second degree of N.S., Count II; not guilty of assault in the second degree of T.G. by strangulation on October 30, 2008, Count VI; and not guilty of possession of marijuana with intent to deliver on November 13, 2008, Count VIII.

¶48 The jury found Clark guilty of human trafficking in the second degree of T.G., Count I; promoting prostitution in the first degree of T.G., Count III; two counts of promoting commercial sexual abuse of H.R. and N.S., Count IV and Count V; unlawful imprisonment of T.G., Count VII; and criminal conspiracy to commit promoting prostitution in the first degree, Count IX. The jury also found that Clark committed the crime of conspiracy to promote prostitution with the intent to benefit, profit, or otherwise advantage a criminal street gang.

¶49 The court imposed a high-end standard-range sentence with an additional 20 months on the jury finding of the aggravating factor for conspiracy to commit promoting prostitution.

## ANALYSIS

### Sufficiency of the Evidence

¶50 Clark claims insufficient evidence supports his conviction for (1) promoting commercial sexual abuse of N.S. and (2) human trafficking of T.G. in the second degree.

¶51 In reviewing sufficiency of the evidence, we view the evidence in the light most favorable to the State to

determine whether any rational trier of fact could have found elements of the crime beyond a reasonable doubt. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). When challenging the sufficiency of the evidence, the defendant admits the truth of the State's evidence, and all reasonable inferences must be drawn in favor of the State and interpreted strongly against the defendant. *Salinas*, 119 Wn.2d at 201. We give deference to the finder of fact in resolving conflicting testimony and weighing the evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004). Circumstantial and direct evidence are accorded equal weight. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

*Promoting Commercial Sexual Abuse of N.S.*

¶52 Clark asserts insufficient evidence supports his conviction for promoting commercial sexual abuse of N.S. because she testified that Clark was not her pimp. To convict Clark of promoting commercial sexual abuse of N.S., the State had to prove that between June 15, 2008 and August 7, 2009, Clark knowingly advanced or profited from a minor engaged in sexual conduct. RCW 9.68A.101(1).

¶53 Viewing the evidence in the light most favorable to the State, the record supports the conviction of promoting commercial sexual abuse of N.S. There is no dispute that N.S. was born August 8, 1991 and was 15 years old when she first met Clark. While N.S. denied Clark was her pimp, the evidence contradicted her testimony.

¶54 A.R. testified that while she was working as a prostitute for Shawn Clark in 2008, N.S. was working as a prostitute for Clark. A.R. said that N.S. stayed in motel rooms and used A.R.'s computer to post advertisements on Craigslist. A.R. testified that N.S. would call or text Clark each time she had a customer and she saw N.S. give Clark the money she made from prostitution.

¶55 S.A. testified that when a customer asked for two prostitutes, Clark drove S.A. and N.S. to the customer. C.D.

testified that N.S. worked as a prostitute for Clark. C.D. said that Johnsen and Clark would drive N.S. and C.D. to the track to earn money and pick them up afterwards.

¶56 Johnsen testified that N.S. worked as a prostitute for Clark. Johnsen said that he and Clark posted advertisements on line for N.S. and C.D., that he and Clark drove N.S. and C.D. to the track, and that he saw N.S. give Clark the money she made from working as a prostitute.

¶57 A number of the exhibits, including text messages, also showed that N.S. worked as a prostitute for Clark.[1] N.S. frequently sent text messages to Clark, calling him "Daddy" and telling him about the money she was making. And the taped telephone conversations between N.S. and Clark showed N.S. continued to work for Clark as a prostitute while he was in jail before trial.[2] The evidence supports

---

[1] For example, text messages between Clark and N.S. in January 2009 state, in pertinent part:

[N.S.] – I got a jug [A "jug" means a "date," or a customer who will pay money for sex.]
[D.C.] – For how much and wat you need a ride to
[N.S.] – No I was saying I caught one, just lettin you kno I got some money
[D.C.] – Yep lets keep it flowing babe, todays are day
[N.S.] – Alright dad
[D.C.] – Have you got som more jugs
[N.S.] – Dad I got to leave soon my moms locked out and I got the key
[D.C.] – Okay but did you hit some more jugs
[N.S.] – I told my mom I was on my way tho
[D.C.] – Okay I'll get you home by 8, lets just get like a jug or two
[N.S.] – Alright dad
[D.C.] – We need to hit a few more jugs, I got to come up with 600 by Sunday, so just work
[N.S.] – Alright
[D.C.] – (Later) Did you hit some more jugs
[N.S.] – No but I'll try to get some more
[D.C.] – No tryin, do.

[2] One of the taped jail telephone conversations that took place on April 5, 2009 states, in pertinent part:

"You ain't got no dough?" N.S. responded, "No, it's been slow . . . I've been going, and, you know, getting the little regulars." . . . On May 1, 2009, N.S. told [Clark] to call back in an hour and she would have more money . . . . [Clark] asked her,

the jury conviction of promoting commercial sexual abuse of N.S.

*Human Trafficking in the Second Degree of T.G.*

¶58 Clark claims insufficient evidence supports his conviction for human trafficking in the second degree of T.G. because he recruited or "procured" her to work as a prostitute in 2007, and not during the charging period of June 15 to December 1, 2008. The record does not support Clark's argument.

¶59 To convict Clark of the crime of human trafficking in the second degree of T.G., the State had the burden of proving that between June 15, 2008 and December 1, 2008, Clark recruited, harbored, transported, or obtained by any means T.G. knowing that force, fraud, or coercion would be used to cause her to engage in forced labor or involuntary servitude. Former RCW 9A.40.100(2)(a)(i) (2003).[3]

¶60 T.G. testified that beginning in August 2007, she and Clark were romantically involved and she "willing[ly]" agreed to work as a prostitute to earn money. But after Clark beat her in early December 2007, and then threatened to kill her after she tried to leave him, she left. T.G. went to live with her mother in Wisconsin in January 2008.

¶61 While T.G. was living in Wisconsin, Clark repeatedly tried to contact her numerous times. At first, T.G. did not have any contact with Clark, but because she still loved him, T.G. eventually agreed to talk to him. Clark repeatedly told T.G. that he loved her and promised T.G. that if she returned, "things were going to be okay again and that he wasn't going to hit [her] anymore." T.G. testified that Clark said "he loved me and that he would be — he would be with

---

"Why? Are you with someone right now?" N.S. replies, "Yeah." [Clark] checked back in with N.S. two hours later and asked how much she made.

[3] The legislature amended RCW 9A.40.100(1)(a) in 2011 to add "transfers" and "receives" to "[r]ecruits, harbors, transports, provides, or obtains by any means another person." LAWS OF 2011, ch. 111, § 1. The legislature also added "or a commercial sex act" to "forced labor or involuntary servitude." LAWS OF 2011, ch. 111, § 1.

me forever." T.G. believed Clark, and on June 18, 2008, she returned to Seattle to be with him.

¶62 T.G. testified that at first, the relationship was fine. However, within a week of returning to work as a prostitute, Clark started treating her harshly and used violence. Clark kept tabs on T.G. and ordered her to post Internet advertisements from the hotel rooms she stayed in. Clark made T.G. work as a prostitute seven days a week, from the time she woke up until he decided she could stop working, and he would not let her eat until she earned money. Clark would punish T.G. by beating her or choking her until she passed out if she did not follow his rules.

¶63 Viewing the evidence in the light most favorable to the State and drawing all reasonable inferences against Clark, sufficient evidence supports the conviction of human trafficking in the second degree of T.G. Clark's success as a pimp and his status in WSSM was directly related to the money he made from prostitution. Before T.G. left, she earned a significant amount of money working as a prostitute. Clark knew T.G. still loved him and made false promises to her in a concerted effort to persuade her to return to Seattle. The evidence shows that Clark knew that if he was successful in convincing T.G. to return to Seattle, he would use coercion or force to subject T.G. to forced labor or involuntary servitude by engaging in prostitution.[4] The

---

[4] The jury instructions define "forced labor" and "involuntary servitude" as follows:

"Forced labor" means the labor or services of a person obtained:

1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person;
2) by means of serious harm or threats of serious harm to that person; or
3) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person would suffer serious harm or physical restraint.
    . . . .
The term "involuntary servitude" means a condition of servitude in which another person is forced to work for the defendant by the use or threat of physical restraint or physical injury.

evidence supports the jury conviction of human trafficking in the second degree.

Double Jeopardy

¶64 As a separate and alternative ground to reverse and vacate the conviction of human trafficking in the second degree, Clark claims punishment for the crimes of human trafficking in the second degree and promoting prostitution in the first degree violate double jeopardy because the two crimes are the same in law and fact under *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932), and *State v. Freeman*, 153 Wn.2d 765, 108 P.3d 753 (2005).

¶65 Interpretation and application of double jeopardy is a question of law that we review de novo. *Freeman*, 153 Wn.2d at 770. The State may charge a defendant with multiple crimes arising from the same criminal conduct. *Freeman*, 153 Wn.2d at 770. However, the double jeopardy clause of the Fifth Amendment to the United States Constitution and article I, section 9 of the Washington State Constitution protect a defendant against multiple punishments for the same offense. The Fifth Amendment states, in pertinent part, "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. The Washington Constitution guarantees that "[n]o person shall . . . be twice put in jeopardy for the same offense." WASH. CONST. art. I, § 9. Our court interprets article I, section 9 in the same manner as the Supreme Court interprets the double jeopardy clause of the Fifth Amendment. *State v. Gocken*, 127 Wn.2d 95, 107, 896 P.2d 1267 (1995).

¶66 "Where a defendant's act supports charges under two criminal statutes, a court weighing a double jeopardy challenge must determine whether, in light of legislative intent, the charged crimes constitute the same offense." *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 815, 100 P.3d 291 (2004). Our Supreme Court has "repeat-

edly rejected the notion that offenses committed during a 'single transaction' are necessarily the 'same offense' " for purposes of double jeopardy. *State v. Vladovic*, 99 Wn.2d 413, 423, 662 P.2d 853 (1983).

¶67 The fact that the same conduct is used to prove each crime is not dispositive. *Freeman*, 153 Wn.2d at 777. The dispositive question in analyzing whether two convictions violate double jeopardy is whether the legislature authorized multiple punishments. *State v. Calle*, 125 Wn.2d 769, 776, 888 P.2d 155 (1995). Subject to constitutional constraints, the legislature has the power to define crimes and assign punishment. *Calle*, 125 Wn.2d at 776. In determining whether the legislature intended to punish two separate offenses, we first look to the language of the statutes. *Calle*, 125 Wn.2d at 776.

¶68 Where the language of the statutes does not expressly authorize cumulative punishment, we apply the *Blockburger* or "same evidence" test to determine legislative intent. The *Blockburger* test is described as follows:

> [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

*Blockburger*, 284 U.S. at 304. The analysis for the same evidence test is described in *Calle* as follows:

> "If there is an element in each offense which is not included in the other, and proof of one offense would not necessarily also prove the other, the offenses are not constitutionally the same and the double jeopardy clause does not prevent convictions for both offenses."

*Calle*, 125 Wn.2d at 777 (quoting *Vladovic*, 99 Wn.2d at 423).

¶69 Notwithstanding a substantial overlap in the evidence that establishes the two crimes, " [i]f each requires

proof of a fact that the other does not,' " the *Blockburger* test and the same evidence test are satisfied. *Albernaz v. United States*, 450 U.S. 333, 338, 101 S. Ct. 1137, 67 L. Ed. 2d 275 (1981) (quoting *Iannelli v United States*, 420 U.S. 770, 785, n.17, 95 S. Ct. 1284, 43 L. Ed. 2d 616 (1975)); *Vladovic*, 99 Wn.2d at 423. In applying the *Blockburger* and the same evidence test, we must consider the offenses as charged. *Freeman*, 153 Wn.2d at 772.

¶70 The State charged Clark with human trafficking in the second degree of T.G. in violation of former RCW 9A.40.100(2)(a)(i), Count I.[5] Former RCW 9A.40.100 states:

> (2)(a) A person is guilty of trafficking in the second degree when such person:
>
> (i) Recruits, harbors, transports, provides, or obtains by any means another person knowing that force, fraud, or coercion as defined in RCW 9A.36.070 will be used to cause the person to engage in forced labor or involuntary servitude.

The State alleged that during a period of time between June 15, 2008 and December 1, 2008, Clark recruited, harbored, transported, provided, or obtained by any means T.G. knowing that force, fraud, or coercion would be used to cause T.G. to engage in forced labor or involuntary servitude.

---

[5] Although the information charged Clark in the alternative with violation of former RCW 9A.40.100(2)(a)(ii), ("[b]enefits financially or by receiving anything of value" from human trafficking), the court instructed the jury only on the means set forth in former RCW 9A.40.100(2)(a)(i). *See State v. Hickman*, 135 Wn.2d 97, 102, 954 P.2d 900 (1998). The "to convict" jury instruction for human trafficking in the second degree states, in pertinent part:

> To convict the defendant of the crime of Human Trafficking in the Second Degree, as charged in Count I, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> 1) That during a period of time intervening June 15, 2008 through December 1, 2008, the defendant recruited, harbored, transported, provided or obtained by any means T.G.;
>
> 2) That the defendant did such recruitment, harboring, transporting, providing or obtaining knowing that force, fraud or coercion would be used to cause T.G. to engage in forced labor or involuntary servitude;
>
> 3) That any of these acts have occurred in the State of Washington.

¶71 The State also charged Clark with the crime of promoting prostitution in the first degree of T.G. in violation of former RCW 9A.88.070(1) (2007),[6] Count III. The State alleged that during a period of time between June 15, 2008 and December 1, 2008, Clark knowingly advanced prostitution by compelling T.G. by threat or force to engage in prostitution.[7] Former RCW 9A.88.070(1) states:

> A person is guilty of promoting prostitution in the first degree if he or she knowingly advances prostitution by compelling a person by threat or force to engage in prostitution or profits from prostitution which results from such threat or force.

¶72 We conclude that under *Blockburger* and the same evidence test, the crimes of human trafficking in the second degree and promoting prostitution in the first degree each required proof of a factual element that the other did not.[8] Significantly, the crime of human trafficking in the second degree requires proof of a different mens rea than the crime of promoting prostitution in the first degree.

¶73 Promoting prostitution in the first degree requires proof that the defendant actually used force to compel a person to engage in prostitution. Under former RCW 9A.88.070(1), a defendant "knowingly advances prostitution *by compelling* a person by threat or force to engage in prostitution."[9] By contrast, the human trafficking statute requires the State to prove the defendant knew that force, fraud, or coercion *"will be used"* in the future to cause another person to engage in forced labor or involuntary

---

[6] The legislature recently amended RCW 9A.88.070(1). Laws of 2012, ch. 141, § 1. The amendment does not affect the analysis of this case.

[7] Under RCW 9A.88.060(1), a person "advances prostitution" if he causes a person to commit or engage in prostitution.

[8] We also reject Clark's argument that the State could charge him only with conspiracy to promote prostitution because the crime of human trafficking and conspiracy to promote prostitution statutes are concurrent. Because the human trafficking statute and the promoting prostitution statute require proof of different elements, Clark cannot establish that the two statutes are concurrent. *State v. Chase*, 134 Wn. App. 792, 802-03, 142 P.3d 630 (2006).

[9] (Emphasis added.)

servitude by engaging in prostitution. Former RCW 9A.40-.100(2)(a)(i).[10] The human trafficking statute requires proof that force, fraud, or coercion *"will be used* to cause the person to engage in forced labor or involuntary servitude." Former RCW 9A.40.100(2)(a)(i).[11] The human trafficking statue also requires proof that the defendant had knowledge that the victim would be subjected to forced labor or involuntary servitude. Again, no such intent is required to prove promoting prostitution in the first degree.[12]

¶74 As charged and proved, the crimes of human trafficking and promoting prostitution are not the same in fact. As the prosecutor pointed out in closing argument, the two offenses required proof of a different mens rea.

> And I would also say — I'd also point out to you, you're going to look at human trafficking and you're going to say, Well, wait a minute, what's the difference here between human trafficking and promoting prostitution? Here's the difference: when you look at the human trafficking instruction, you will see that there is no requirement for the crime of human trafficking — that the person who is the human trafficker uses force at the time of recruitment or at the time of transport. He's just got to know that it's going to be used.

> And when we talk about promoting prostitution, . . . you'll see that promoting prostitution requires that force be used. And there's a difference there. That's why they are charged [as] different crimes in this case, there is a difference.

¶75 In sum, under the *Blockburger* and same evidence test, the offenses of human trafficking in the second degree and promoting prostitution in the first degree are not the same in law. And as charged and proved, the offenses are

---

[10] (Emphasis added.)

[11] (Emphasis added.)

[12] In addition, proof that Clark "recruited, harbored, transported, provided, or obtained by any means" T.G. is not required to prove promoting prostitution in the first degree.

not the same in fact. The offense of human trafficking in the second degree requires proof of a different mens rea that promoting prostitution does not.

¶76 We also reject Clark's argument that because the two crimes serve the same purpose, the merger doctrine applies. If applicable, the merger doctrine is a tool of statutory construction used to "help determine legislative intent, where the degree of one offense is elevated by conduct constituting a separate offense." *State v. Kier*, 164 Wn.2d 798, 804, 194 P.3d 212 (2008). In *Freeman*, the court held that if the greater offense " 'typically carries a penalty that incorporates punishment for the lesser included offence,' " a court vacates the lesser offense for purposes of double jeopardy. *Freeman*, 153 Wn.2d at 775 (quoting Akhil Reed Amar & Jonathan L. Marcus, *Double Jeopardy Law After Rodney King*, 95 COLUM. L. REV. 1, 28 (1995)). But the merger doctrine

"only applies where the Legislature has clearly indicated that in order to prove a particular degree of crime . . . the State must prove not only that a defendant committed that crime . . . but that the crime was accompanied by an act which is defined as a crime elsewhere in the criminal statutes."

*Freeman*, 153 Wn.2d at 777-78 (quoting *Vladovic*, 99 Wn.2d at 420-21). Even if two convictions appear to merge on an abstract level, we must determine whether there is an independent purpose for each offense. *Freeman*, 153 Wn.2d at 773. We conclude that because the two crimes serve an independent purpose, and proof of one crime is not necessary to prove the other, the merger doctrine does not apply.

¶77 Promoting prostitution in the first degree was enacted as part of the 1975 criminal code to target those participating in and profiting from the business of selling sex for money.[13] LAWS OF 1975, 1st Ex. Sess., ch. 260, § 9A.88.070. The legislature enacted the crime of human

---

[13] In 2007, the legislature eliminated the provision in RCW 9A.88.070 addressing promoting prostitution of a person less than 18 years old and enacted the

trafficking in 2003. LAWS OF 2003, ch. 267, § 1. The Washington law is modeled after the Trafficking Victims Protection Act of 2000, Pub. L. No. 106-386, sections 101 to 113, 114 Stat. 1464 (2000) (codified at 22 U.S.C. section 7101(a)). The legislative history shows that the legislature recognized that Washington had statutes that punished a person for prostitution but did not have a criminal statute that specifically prohibited human trafficking. FINAL B. REP. on Substitute H.B. 1175, 58th Leg., Reg. Sess. (Wash. 2003). As the legislative history notes, "A person may be trafficked for a number of reasons including forced prostitution." FINAL B. REP. at 1.

¶78 The legislature codified the crime of human trafficking in chapter 9A.40 RCW, "Kidnapping, Unlawful Imprisonment, and Custodial Interference." The crime of promoting prostitution is codified in chapter 9A.88 RCW, "Indecent Exposure—Prostitution." Human trafficking in the second degree is a more serious offense than promoting prostitution in the first degree. Human trafficking in the second degree is a class A felony[14] and a level 12 offense. Promoting prostitution in the first degree is a class B felony[15] and a level 8 offense.

¶79 Clark also claims his conviction for unlawful imprisonment of T.G. and the convictions for either human trafficking in the second degree or promoting prostitution in the first degree of T.G. violate double jeopardy. We disagree.

¶80 To convict Clark of the crime of unlawful imprisonment, the State had to prove that Clark knowingly restrained T.G. on November 12. RCW 9A.40.040. Restraint is not an element of either human trafficking or promoting prostitution. Proof of the charge of unlawful imprisonment

---

separate crime of commercial sexual abuse of a minor. LAWS OF 2007, ch. 368, §§ 1, 2, 13.

[14] Former RCW 9A.40.100(2)(b).

[15] RCW 9A.88.070(2).

was based solely on the incident on November 12 when Clark punched T.G. in the face, then forcibly put her in the El Camino and drove away. The crime of unlawful imprisonment that occurred on November 12 did not constitute proof of either human trafficking in the second degree or promoting prostitution in the first degree.

¶81 Because the remainder of this opinion has no precedential value, the panel has determined it should not be published in accordance with RCW 2.06.040.

GROSSE and COX, JJ., concur.

Reconsideration denied October 24, 2012.

Review denied at 176 Wn.2d 1028 (2013).