IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>PATRICK MICHAEL CALLAHAN,<br><br>Appellant. | No. 86613-3-I<br><br><br>PUBLISHED OPINION |

BOWMAN, A.C.J. — A jury convicted Patrick Michael Callahan of human trafficking in the second degree, sexual misconduct with a minor in the first and second degree, rape in the third degree, and special allegations of crimes against a minor with sexual motivation. Callahan appeals his conviction for trafficking in the second degree, arguing insufficient evidence supports that he caused L.M. to engage in a commercial sex act. He also argues the trial court erred by imposing Department of Corrections (DOC) supervision fees, a victim penalty assessment (VPA), and the DNA collection fee. Because sufficient evidence supports the conviction, we affirm, but we remand for the trial court to strike the fees from his judgment and sentence.

FACTS

L.M. was born to an unstable family in California. Her parents often invited people to their house to use drugs, and L.M. experienced physical and

sexual abuse. L.M. often went to school hungry, unbathed, and generally unkempt.

Callahan is a retired firefighter. Callahan's daughter, S.C., attended the same elementary school as L.M., and Callahan volunteered as a math tutor in L.M.'s third grade classroom. L.M. struggled in school, so her teacher often paired her with Callahan to work on math in the back of the classroom. Callahan noticed that L.M. came to school hungry and unbathed and began to ask her questions about her home environment.

One day, Callahan invited L.M. to his home to play with S.C. While the two children did not know each other well, L.M. accepted Callahan's invitation because she "wanted a friend." Soon after, L.M. regularly spent time at Callahan's house.[1]

Eventually, L.M. began sleeping over at the Callahans' house. Callahan would bathe both S.C. and L.M. and wash L.M.'s hair. Sometimes, when L.M. spent the night, she would sleep in Callahan's bed with him. At first, Callahan's wife or S.C. would also sleep in his bed. But over time, only L.M. and Callahan slept alone in the bed, while Callahan's wife slept on the couch and S.C. slept in her room. As L.M. approached the end of third grade, Callahan began making her touch him when they slept together. He then started having her perform oral sex.[2]

---

[1] L.M. and S.C. eventually became very close friends, each describing the other as "a sister."

[2] L.M. never disclosed the abuse to S.C. or Callahan's wife because she "didn't want to hurt [them]."

By the end of third grade, L.M. was spending more time at the Callahans' home than at her parents' home. Callahan continued to sexually assault her.[3] L.M. testified that when she resisted Callahan's assaults, he would threaten to send her back home to her parents.

In 2015, the Callahans decided to move from California to Washington. At the time, L.M. was 10 years old. L.M. wanted to go to Washington with the Callahans, and her parents agreed to let her move with them.[4] So, the Callahans and L.M. moved to Port Angeles. While in Port Angeles, Callahan continued to provide L.M. with food, clothing, school supplies, medicine, and shelter.

Callahan also continued to sexually assault L.M. Typically, the abuse occurred when Callahan's wife and S.C. were out of the house. Callahan sexually assaulted L.M. almost daily throughout middle and high school. And L.M. often refused or resisted sex with him. But when she did, he would cry and treat her differently. L.M. said she did not feel like she had a choice about whether to have sex with Callahan because she would be "guilted back into saying yes." He also repeatedly threatened to send her back to California if she said no to intercourse. L.M.'s understanding was that she would "end up back with [her] parents" if she did not do what he wanted. And L.M. did not want to return to her parents.

---

[3] The assaults soon escalated to vaginal and, eventually, anal intercourse.

[4] Callahan did not pursue a formal adoption or guardianship of L.M. Instead, her father wrote "a note stating that [Callahan] would have basically power to make decisions" for L.M. "as a parent would do, for whatever she needed — doctors or emergency situations."

On Friday, October 22, 2021, Callahan had L.M perform oral sex on him. L.M., who was now 18 years old, "just snapped" and "couldn't handle it anymore," so she "decided [she] had to leave." L.M. told her boyfriend about the incident[5] and they discussed getting her out of the house. The next night, Callahan touched L.M.'s chest and put his mouth on her breasts. On Sunday morning, October 24, L.M. secretly left the Callahans' house with help from her boyfriend, his family, and another friend's parents.

L.M. reported the assaults to the police, who arranged an exam with a sexual assault nurse examiner. The nurse swabbed L.M.'s breasts and mouth to preserve any DNA evidence. Subsequent DNA testing showed "very strong support for the inclusion of Patrick Callahan as a possible contributor" to the DNA obtained from L.M.'s breasts.

The State charged Callahan with first and second degree sexual misconduct with a minor, third degree rape, rape of a child in the third degree, and second degree trafficking. It also charged several special allegations. The case proceeded to trial in November 2022. At trial, Callahan moved to dismiss the second degree trafficking charge for insufficient evidence. The court denied the motion. The State then dismissed the third degree rape of a child count for insufficient evidence.

---

[5] L.M. had told her boyfriend the summer before that Callahan was sexually assaulting her. He was the first person she ever disclosed the abuse to. And she told him not to tell anyone because she was afraid she would be sent "back to California or be put in some random person's home."

The jury found Callahan guilty of sexual misconduct with a minor in the first and second degree, rape in the third degree, and second degree trafficking.[6] The court imposed a 240-month sentence for the trafficking conviction.[7] The court also imposed DOC supervision fees, a VPA, and a DNA collection fee as part of Callahan's community custody conditions.[8]

Callahan appeals.

ANALYSIS

Callahan argues insufficient evidence supports his conviction for trafficking in the second degree. He also argues we should remand for the court to strike the DOC supervision fees, the VPA, and the DNA collection fee.

1. Sufficiency of the Evidence

Callahan argues insufficient evidence supports his conviction for trafficking in the second degree because no evidence shows that he caused L.M. to engage in a commercial sex act. We disagree.

We review sufficiency of the evidence de novo. *State v. Hummel*, 196 Wn. App. 329, 352, 383 P.3d 592 (2016). To determine whether sufficient

---

[6] By special verdict, the jury found Callahan guilty of the special allegations that his crimes were part of an ongoing pattern of sexual abuse of a minor and that he used his position of trust to facilitate the crimes. As to the trafficking charge, the jury also found that Callahan committed the crime with sexual motivation.

[7] The court imposed consecutive exceptional sentences upward of 60 months each for the first degree sexual misconduct with a minor and third degree rape convictions. It imposed a high-end standard-range sentence of 364 days for sexual misconduct of minor in the second degree. And it ran those counts concurrent to the trafficking sentence.

[8] The court also imposed the mandatory $10,000 trafficking of a minor fine, which it reduced to $3,333, the maximum reduction allowed by statute. RCW 9A.40.100(4)(b), (c).

evidence supports a conviction, we view the evidence in a light most favorable to the State and consider whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. DeJesus*, 7 Wn. App. 2d 849, 882, 436 P.3d 834 (2019). A sufficiency challenge admits the truth of the State's evidence and accepts the reasonable inferences made from it. *State v. O'Neal*, 159 Wn.2d 500, 505, 150 P.3d 1121 (2007). And we defer to the fact finder on issues involving conflicting testimony, witness credibility, and the persuasiveness of the evidence. *DeJesus*, 7 Wn. App. 2d at 883.

Here, the State charged Callahan with trafficking in the second degree under RCW 9A.40.100(3). The trial court instructed the jury that to convict Callahan of that crime, the State must show beyond a reasonable doubt that he "engaged in trafficking." Then, consistent with RCW 9A.40.100(3)(a)(i), the court instructed the jury:

> A person engages in trafficking when he harbors, transports, obtains, or receives by any means another person, knowing or in reckless disregard of the fact that the other person is less than [18] years of age and is caused to engage in a commercial sex act.

And, consistent with RCW 9A.40.100(6)(a), the court defined "commercial sex act" as "any act of sexual contact or sexual intercourse for which something of value is given or received by any person."

Callahan does not dispute that sufficient evidence shows he harbored, transported, obtained, or received L.M., knowing that she was under the age of 18 when she moved with him from California to Washington. Instead, he argues no evidence shows that he caused L.M. to engage in a "commercial sex act."

6

L.M. testified that beginning at age nine, Callahan caused her to engage in several acts of sexual contact and sexual intercourse. She said she often resisted those acts, but Callahan would threaten to return her to California if she refused. L.M. understood this to mean that she would "end up back with [her] parents" if she did not do what he wanted. And L.M. did not want to return to her parents. Viewing L.M.'s testimony and all inferences from it in the light most favorable to the State, a rational trier of fact could conclude that Callahan caused L.M. to engage in acts of sexual contact and intercourse with him in return for ongoing housing, food, and support of her basic needs—things of value.[9]

Callahan says we should interpret the trafficking statute to apply only "when children are treated as a commodity between a buyer and seller, thus requiring participation of a third party." He acknowledges that no Washington authorities support this position. Instead, he argues we should follow *United States v. Elbert*, 561 F.3d 771 (8th Cir. 2009), which he claims "supports the interpretation that a charge of trafficking requires the participation of a third party in the commercial sex act." But Callahan's argument fails for at least two reasons. First, the legislative intent of the trafficking statute is plain, so we need not engage in statutory construction. And second, even if we looked to *Elbert* for guidance, that case does not support Callahan's argument.

---

[9] Callahan does not dispute that housing, food, and monetary support are things "of value." RCW 9A.40.100(6)(a). Instead, he argues that his threat to return L.M. to California is not affirmative evidence that he offered to support L.M. and provide for her if she had sex with him. But a reasonable juror could conclude that a person who engages in a sex act while under the threat that refusal of the sex act will result in the loss of something of value amounts to exchanging sexual contact for something of value.

7

A. Legislative Intent

We review issues of statutory interpretation de novo. *State v. Pratt*, 196 Wn.2d 849, 852, 479 P.3d 680 (2021). When tasked with interpreting the meaning and scope of a statute, our fundamental goal is to determine and give effect to the intent of the legislature. *State v. Sweany*, 174 Wn.2d 909, 914, 281 P.3d 305 (2012). We look first to the plain language of the statute as the "surest indication of legislative intent." *State v. Ervin*, 169 Wn.2d 815, 820, 239 P.3d 354 (2010). If the statute's meaning is plain on its face, then we must give effect to that plain meaning as an expression of legislative intent. *State v. Hirschfelder*, 170 Wn.2d 536, 543, 242 P.3d 876 (2010). If, after this inquiry, the statute is susceptible to more than one reasonable interpretation, it is ambiguous, and we may use statutory construction, legislative history, and relevant case law to discern legislative intent. *Ervin*, 169 Wn.2d at 820. And we presume the legislature does not intend absurd results. *Id.* at 823-24.

RCW 9A.40.100(6)(a) defines "commercial sex act" as "any" sexual contact for which something of value is given or received by "any" person. We have repeatedly construed the word "any" to mean "every" and "all." *State v. Sutherby*, 165 Wn.2d 870, 882, 204 P.3d 916 (2009). So, the plain language of the statute expresses a legislative intent to include every exchange of sex for value as a commercial sex act. The broad language does not limit commercial sex acts to sexual contact with a third person. Indeed, it would be an absurd result to proscribe trafficking as the harboring of minors for the purpose of sex acts with third parties but not the harboring of minors for the purpose of sex acts

8

with the harborer.  Both result in the same harm—harboring children for sexual exploitation.[10]

    B. *Elbert*

In any event, even if the trafficking statute were ambiguous, *Elbert* does not support Callahan's argument.  In that case, the defendant took and housed three young girls and caused them to engage in prostitution.  *Elbert*, 561 F.3d. at 774.  The defendant pleaded guilty to sex trafficking of a child under 18 U.S.C. § 1591.  *Id.* at 773.  Like RCW 9A.40.100(6)(a), the federal statute defines "commercial sex act" as "any sex act, on account of which anything of value is given to or received by any person."  18 U.S.C. § 1591(e)(3).

Before trial, the defendant moved to admit evidence that the victims engaged in prostitution before and after he met them.  *Elbert*, 561 F.3d at 775-76.  According to the defendant, the evidence was relevant to show that he did not cause the victims to engage in commercial sex acts.[11]  *Id*. at 777.  The trial court denied Elbert's motion.  *Id.* at 775.  The Eight Circuit affirmed.  *Id*. at 777-78.  It concluded that whether the victims engaged in acts of prostitution before or after their encounters with the defendant was irrelevant, proving only that

---

[10] We note that Callahan points to no other crime that would proscribe such conduct.  While child rape (RCW 9A.44.073), child molestation (RCW.9A.44.083), and sexual misconduct with a minor (RCW 9A.44.093) proscribe sexual contact with a child, they do not address the acts of harboring, transporting, obtaining, or receiving the child and causing the child to exchange sex for something of value.  So, under Callahan's theory, a defendant could avoid punishment for those acts so long as he causes the child to exchange sex with himself for value rather than with a third party.

[11] The defendant also had sex with the victims.  *Elbert*, 561 F.3d at 774.  But there was no evidence that the defendant exchanged something of value for the sexual contact, and the government did not charge him for such acts.

others may be guilty of the same crime the government charged him with. *Id.* at 777. Contrary to Callahan's assertion, *Elbert* does not hold that commercial sex acts require the participation of a third party.[12]

Because the State presented sufficient evidence that Callahan harbored, transported, obtained, or received L.M., that he knew she was under the age of 18, and that he caused her to engage in a commercial sex act, we affirm his conviction for trafficking in the second degree.

2. Legal Financial Obligations

Callahan argues, and the State concedes, that we should remand for the trial court to strike the DOC supervision fees, $500 VPA, and $100 DNA collection fee. We accept the State's concession.

The trial court sentenced Callahan on January 26, 2023. As part of the sentence, it imposed DOC supervision fees, a $500 VPA, and a $100 DNA collection fee. Callahan filed a notice of appeal on the same day.

On July 1, 2022, several months before the trial court sentenced Callahan, the legislature amended RCW 9.94A.703 to remove the payment of DOC supervision fees as a community custody condition. LAWS OF 2022, ch. 29, § 8. As a result, the trial court should not have imposed those fees, and we remand to strike this community custody condition.

---

[12] Callahan also points to *State v. Clark*, 170 Wn. App. 166, 283 P.3d 1116 (2012), and *State v. Braun*, 20 Wn. App. 2d 756, 502 P.3d 884 (2022), as two "Washington cases in which trafficking was charged [that] involved prostitution." He is correct. But he fails to explain how those cases show that a commercial sex act must involve a third party.

On July 1, 2023, an amendment to RCW 7.68.035 took effect, providing that the court "shall not impose the [VPA] under this section if the court finds that the defendant, at the time of sentencing, is indigent as defined in RCW 10.01.160(3)." LAWS OF 2023, ch. 449, § 1; RCW 7.68.035(4). At the same time, the legislature amended RCW 43.43.7541 and eliminated the previously mandated $100 DNA collection fee. LAWS OF 2023, ch. 449, § 4. Under RCW 43.43.7541(2), on the defendant's motion, the court must waive any DNA collection fee imposed before July 1, 2023.

The State concedes that the amendment to RCW 7.68.035 applies to Callahan, as it took effect while his appeal was pending. *See State v. Ellis*, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023) (although the amendment to the statute imposing interest on restitution took effect after the defendant's resentencing, it applied to the defendant because the case was on direct appeal), *review granted*, 4 Wn.3d 1009, 564 P.3d 547 (2025). We accept the State's concession and remand for the court to strike the VPA.[13]

The State also concedes that RCW 43.43.7541(2) applies because the court imposed Callahan's DNA collection fee before July 1, 2023. Again, we accept the State's concession and remand for the court to strike the DNA collection fee.

---

[13] Callahan argues, and the State does not dispute, that the court likely considered Callahan indigent when it waived all nonmandatory fees and reduced the mandatory trafficking fine as much as the statute permits. *See* RCW 9A.40.100(4)(b), (c).

11

We affirm Callahan's conviction for second degree trafficking but remand for the trial court to strike the DOC supervision fees, VPA, and DNA collection fee from his judgment and sentence.

_____, ACJ

WE CONCUR:

_____
Díaz, J.

_____
Birk, J.